UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| MARTHA JENNIFER CAMP, ADAM CAMP, WILLIAM E. THOMPSON, AND JUANITA THOMPSON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>        Plaintiffs,<br><br>  vs.<br><br>OHANA MILITARY COMMUNITIES, LLC, HUNT MH PROPERTY MANAGEMENT, LLC,  DOE DEFENDANTS 1-20,<br><br>        Defendants. | CIV. NO. 24-00003 LEK-KJM |

**ORDER DENYING WITHOUT PREJUDICE THE
CAMP PLAINTIFFS' MOTION FOR CLASS CERTIFICATION;
DENYING AS MOOT POWELL'S JOINDER TO THE MOTION; AND
ORDERING THE SUBMISSION OF A JOINT STATEMENT, OR ALTERNATIVELY
FURTHER BRIEFING, REGARDING RULE 23(C)(4) CLASS CERTIFICATION**

On May 8, 2025, Plaintiffs Martha Jennifer Camp
("Mrs. Camp"), Adam Camp ("Mr. Camp" and collectively "the
Camps"), William E. Thompson ("Mr. Thompson"), and Juanita
Thompson ("Mrs. Thompson" and collectively "the Thompsons"),
individually and on behalf of all others similarly situated,
(all collectively, "the Camp Plaintiffs") filed their Motion for
Class Certification ("Motion"). [Dkt. no. 56.] The same motion
was also filed in Powell v. Ohana Military Communities et al.,
CV 24-00184 LEK-KJM ("Powell"), a case that is consolidated with
the instant case. See Powell, dkt. no. 43; see also Powell,

First Amended Stipulation and Order to Consolidate <u>Camp</u> and

<u>Powell</u> Pursuant to Fed. R. Civ. P. 42(a), filed 5/16/25 (dkt.

no. 54). On May 12, 2025, Plaintiff Cleophas C. Powell

("Powell"), on behalf of himself and all similarly situated,

("the <u>Powell</u> Plaintiffs," and collectively with the <u>Camp</u>

Plaintiffs, "Plaintiffs") filed a joinder in the Motion

("Joinder"). [Dkt. no. 62; <u>Powell</u>, dkt. no. 50.]

      On October 2, 2025, Third-Party Defendant United

States of America ("United States" or "the Government") filed

its opposition to the Motion ("Government's Opposition"). [Dkt.

no. 89.] On October 3, 2025, Defendant Ohana Military

Communities, LLC ("Ohana") and Defendant/Third-Party Plaintiff

Hunt MH Property Management, LLC ("Hunt" and collectively, "the

Landlord Defendants") filed their opposition to the Motion

("Landlords' Opposition"). [Dkt. no. 90.] The <u>Camp</u> Plaintiffs

replied to the Government's Opposition, the Landlords'

Opposition, and the Joinder on October 17, 2025 ("Reply"). [Dkt.

no. 93.] The Motion came on for hearing on November 25, 2025.

For the reasons set forth below, the Motion is denied without

prejudice, the Joinder is denied as moot, and the parties are

ordered to submit a joint statement, or alternatively further

briefing, regarding issue class certification.

## BACKGROUND

On November 17, 2023, the Camp Plaintiffs filed a
putative class action Complaint ("Camp Complaint") against the
Landlord Defendants in the State of Hawai`i First Circuit Court,
which was subsequently removed. [Defendants Ohana Military
Communities, LLC and Hunt MH Property Management, LLC's Notice
of Removal, filed 1/3/24 (dkt. no. 1), Declaration of Randall C.
Whattoff, Exh. 1 (state court docket sheet and filings) at
PageID.38-69 (Camp Complaint).] The Camp Plaintiffs allege that
the Landlord Defendants acquired and sold contaminated water
from the United States Department of the Navy ("Navy") through
the Joint Base Pearl Harbor-Hickam Water System ("JBPHH Water
System"). They further allege that the Landlord Defendants
provided the contaminated water to the Camp Plaintiffs. See id.
at ¶¶ 4, 40. The Camp Plaintiffs claim that the Landlord
Defendants knew or should have known of the prior fuel leaks at
the Red Hill Bulk Fuel Storage Facility ("Red Hill") – prior
fuel leaks that they allege contaminated the water delivered to
the Camp Plaintiffs. See, e.g., id. at ¶¶ 40, 46.c., 51.

The Camp Plaintiffs allege the following claims:
negligence ("Count I"); strict liability ("Count II"); medical
monitoring ("Count III"); private nuisance ("Count IV"); an
unfair or deceptive trade or practice ("UDAP") claim and an
unfair methods of competition ("UMOC") claim pursuant to Hawai`i

3

Revised Statutes Section 480-2 ("Count V"); breach of the
implied warranty of habitability ("Count VI"); trespass
("Count VII"); breach of contract ("Count VIII"); and violations
of several provisions of the Residential Landlord-Tenant Code,
Hawai`i Revised Statutes Chapter 521 ("Count IX"). [Id. at
pgs. 18-30.] The Camp Plaintiffs seek: general, special, treble,
consequential, and punitive damages; provision of a medical
monitoring program; attorneys' fees and costs; disgorgement of
profits; prejudgment interest; and preliminary and permanent
injunctive relief requiring the Landlord Defendants to warn
existing tenants of known water contamination in units, cease
collecting rent from existing tenants while the water remains
contaminated, cease enforcing the Early Move-Out and Reletting
Charge provisions in their leases unless certain circumstances
are met, deem void all purported waivers of liability in favor
of Defendants, and cease entering into any new leases for
residential property until they adequately address the water
contamination. [Id. at pgs. 31-32.]

On July 30, 2024, the Court issued its Order Granting
in Part and Denying in Part Defendants' Motion to Dismiss
Complaint Filed November 17, 2023 ("7/30/24 Order"). [Dkt.
no. 26.[1]] The Court dismissed with prejudice Counts II, III, and

---

[1] The 7/30/24 Order is also available at 2024 WL 3594742.

the portion of Count V alleging a UDAP claim. The Court dismissed without prejudice the portion of Count V alleging a UMOC claim. 7/30/24 Order, 2024 WL 3594742, at *11. The UMOC claim was dismissed because the Complaint failed to sufficiently allege how the Landlord Defendants' actions negatively affected competition or harmed competitors in the leased residential housing market. See id. at *10-11. The Camp Plaintiffs, however, never sought leave to file an amended complaint to cure the defects in their UMOC claim. Thus, the remaining claims are Counts I, IV, VI, VII, VIII, and IX.

On January 21, 2025, Hunt filed its First Amended Third-Party Complaint Against United States of America, pursuant to the Federal Tort Claims Act, Title 28 United States Code Section 2674 ("FTCA"). [Dkt. no. 43 at ¶ 3.] Hunt alleges that the Camp Plaintiffs' claims are predicated on the fuel spill from Red Hill, which is owned and operated by the United States and the Navy. See, e.g., id. at ¶¶ 7-8, 12. Hunt alleges the following claims against the United States: common law indemnity; equitable indemnity and/or subrogation; contribution, apportionment, and/or reimbursement; and negligence. [Id. at pgs. 9-15.] The Landlord Defendants seek compensatory and general damages, attorneys' fees and costs, full indemnification, interest, and any other appropriate relief. [Id. at pgs. 15-16.]

In their Motion, the <u>Camp</u> Plaintiffs seek to certify a class and subclass of individuals, who were allegedly harmed by the distribution of jet fuel-contaminated water between November 20, 2021 and March 31, 2022, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3). [Motion, Mem. in Supp. at 1-2, 8-9.]

The <u>Camp</u> Plaintiffs define their proposed class as:

> All persons authorized to reside within an Ohana Military Communities, LLC property managed by Hunt MH Property Management, LLC from November 20, 2021 to March 31, 2022 [("the Class")].

[<u>Id.</u> at 2 (emphasis omitted).] The <u>Camp</u> Plaintiffs define their proposed subclass as:

> All persons who entered into a contract with [the Landlord] Defendants and paid lease rent on a housing unit entitled to receive potable water distributed by Ohana Military Communities, LLC or Hunt MH Property Management, LLC effective between November 20, 2021 and March 31, 2022 [("the Subclass")].

[<u>Id.</u> (emphasis omitted)] All parties oppose Powell's Joinder. <u>See</u> Reply at 2-3; Govt.'s Opp. at 2; Landlords' Opp. at 3-5.[2]

---

[2] The Court considers the Joinder as a joinder of simple agreement because it was filed more than three days after the Motion and is not "supported by a memorandum that complies with LR7.4(a) and (b) supplementing the motion . . . joined in." <u>See</u> Local Rule LR7.7. Because the <u>Camp</u> Plaintiffs oppose the Joinder and because the Court denies the Motion without prejudice, the Joinder is denied as moot. The remainder of the instant Order therefore does not discuss Powell and the Joinder.

## STANDARD

I. **Standing**

> To have standing to sue a particular
> defendant, a plaintiff must have experienced an
> injury in fact that is fairly traceable to the
> challenged action of that defendant. Lujan v.
> Defs. of Wildlife, 504 U.S. 555, 560, 112 S. Ct.
> 2130, 119 L. Ed. 2d 351 (1992). "That a suit may
> be a class action . . . adds nothing to the
> question of standing, for even named plaintiffs
> who represent a class 'must allege and show that
> they personally have been injured, not that
> injury has been suffered by other, unidentified
> members of the class to which they belong and
> which they purport to represent.'" Simon v. E.
> Ky. Welfare Rts. Org., 426 U.S. 26, 40 n.20, 96
> S. Ct. 1917, 48 L. Ed. 2d 450 (1976) (quoting
> Warth v. Seldin, 422 U.S. 490, 502, 95 S. Ct.
> 2197, 45 L. Ed. 2d 343 (1975)). . . .

Martinez v. Newsom, 46 F.4th 965, 970 (9th Cir. 2022) (some

alterations in Martinez).

"In a class action, standing is satisfied if at least

one named plaintiff meets the requirements." DZ Rsrv. v. Meta

Platforms, Inc., 96 F.4th 1223, 1239 (9th Cir. 2024) (quotation

marks and citation omitted), *cert. denied*, 145 S. Ct. 1051

(2025).

> To show Article III standing, "[t]he plaintiff
> must have (1) suffered an injury in fact,
> (2) that is fairly traceable to the challenged
> conduct of the defendant, and (3) that is likely
> to be redressed by a favorable judicial
> decision." [Spokeo, Inc. v. Robins, 578 U.S. 330,
> 338, 136 S. Ct. 1540 (2016).] A plaintiff
> establishes an injury in fact if the plaintiff
> suffered "'an invasion of a legally protected
> interest' that is 'concrete and particularized'
> and 'actual or imminent, not conjectural or

> hypothetical.'" Id. at 339, 136 S. Ct. 1540
> (quoting Lujan v. Defs. of Wildlife, 504 U.S.
> 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351
> (1992)). An injury qualifies as "concrete" if it
> is "real" rather than "abstract" — that is, "it
> must actually exist." Id. at 340, 136 S. Ct.
> 1540.!

Wakefield v. ViSalus, Inc., 51 F.4th 1109, 1117 (9th Cir. 2022)

(some alterations in Wakefield). The Ninth Circuit Court of

Appeals has stated that:

> In our previous decision, we held that "the
> temporary loss of use of one's money constitutes
> an injury in fact for purposes of Article III."
> [Van v. LLR, Inc., 962 F.3d 1160,] 1164 [(9th
> Cir. 2020) (per curiam)]. The question now is
> whether the loss can be for such a short amount
> of time or involving such a small amount of money
> that the loss is "too trifling" to be a concrete
> injury. We answer that question: No. As we held
> in our previous decision, "a loss of even a small
> amount of money is ordinarily an 'injury,'" id.
> at 1162 (quoting Czyzewski [v. Jevic Holding
> Corp.], 580 U.S. [451,] 464, 137 S. Ct. 973
> [(2017)]), and "[a]ny monetary loss suffered by
> the plaintiff satisfies the injury in fact
> element," id. (quoting Carter [v. HealthPort
> Techs., LLC], 822 F.3d [47,] 55 [(2d Cir. 2016)])
> (alteration adopted). Today, we reaffirm this
> language. Any monetary loss, even one as small as
> a fraction of a cent, is sufficient to support
> standing. See TransUnion LLC v. Ramirez, ––– U.S.
> ––––, 141 S. Ct. 2190, 2204, 210 L. Ed. 2d 568
> (2021) ("If a defendant has caused physical or
> monetary injury to the plaintiff, the plaintiff
> has suffered a concrete injury in fact under
> Article III."). Thus, the presence of class
> members who suffered only a fraction of a cent of
> harm does not create an individualized issue that
> could predominate over class issues.!

Van v. LLR, Inc., 61 F.4th 1053, 1064 (9th Cir. 2023) (some

alterations in Van) (footnote omitted).

## II.  **Class Certification**

"Before it can certify a class, a district court must conduct a 'rigorous analysis' to ensure that the requirements of Federal Rule of Civil Procedure 23 are satisfied." Noohi v. Johnson & Johnson Consumer Inc., 146 F.4th 854, 862 (9th Cir. 2025) (quoting Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 664 (9th Cir. 2022) (en banc)). The rigorous analysis required when a court considers a motion for class certification may require resolving disputes about historical facts that are relevant to the class certification analysis. See Olean, 31 F.4th at 667. Rule 23, however, "grants courts no license to engage in free-ranging merits inquiries at the certification stage." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Id. (citations omitted). "District courts have broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." Gonzalez v. U.S. Immigr. & Customs Enf't, 975 F.3d 788, 807 (9th Cir. 2020) (citation and internal quotation marks omitted).

### A.    **Federal Rule of Civil Procedure 23(a)**

Federal Rule of Civil Procedure 23(a) states:

(a)  Prerequisites. One or more members of a
class may sue or be sued as representative
parties on behalf of all members only if:

(1)  the class is so numerous that
joinder of all members is impracticable;

(2)  there are questions of law or fact
common to the class;

(3)  the claims or defenses of the
representative parties are typical of the
claims or defenses of the class; and

(4)  the representative parties will
fairly and adequately protect the interests
of the class.

The Rule 23(a) prerequisites are: "(1) numerosity;

(2) commonality; (3) typicality; and (4) adequacy . . . ."

Parsons v. Ryan, 754 F.3d 657, 674 (9th Cir. 2014).

**B.**    **Federal Rule of Civil Procedure 23(b)(3)**

Federal Rule of Civil Procedure 23(b)(3) states:

(b)  Types of Class Actions.  A class action
may be maintained if Rule 23(a) is satisfied and
if:

. . . .

(3)  the court finds that the questions
of law or fact common to class members
predominate over any questions affecting
only individual members, and that a class
action is superior to other available
methods for fairly and efficiently
adjudicating the controversy. . . .

A Rule 23(b)(3) class is commonly referred to as a "damages

class." See, e.g., DZ Rsrv., 96 F.4th at 1232.

> [A] class seeking damages . . . must satisfy
> Rule 23(b)(3), which requires the common
> question(s) "predominate over any questions
> affecting only individual members." Fed. R. Civ.
> P. 23(b)(3). While common questions must be
> capable of class-wide adjudication, "[a]n
> individual question is one where 'members of a
> proposed class will need to present evidence that
> varies from member to member.'" Lara [v. First
> Nat'l Ins. Co. of Am.], 25 F.4th [1134,] 1138
> [(9th Cir. 2022)] (quoting Tyson Foods, Inc. v.
> Bouaphakeo, 577 U.S. 442, 453, 136 S. Ct. 1036,
> 194 L. Ed. 2d 124 (2016)). In short,
> "Rule 23(a)(2) asks whether there are issues
> common to the class, and Rule 23(b)(3) asks
> whether these common questions predominate."
> Abdullah v. U.S. Sec. Assocs., Inc., 731 F.3d
> 952, 957 (9th Cir. 2013). "Showing predominance
> is difficult, and it regularly presents the
> greatest obstacle to class certification." Black
> Lives Matter L.A. [v. City of Los Angeles], 113
> F.4th [1249,] 1258 [(9th Cir. 2024)] (internal
> quotation marks and citation omitted).

Small v. Allianz Life Ins. Co. of N. Am., 122 F.4th 1182, 1198

(9th Cir. 2024) (some alterations in Small), cert. denied, 145

S. Ct. 2852 (2025).

To evaluate superiority, courts consider four

"pertinent" factors: 1) the class members' interests in

individually controlling the prosecution or defense of separate

actions; 2) the extent and nature of any litigation concerning

the controversy already begun by or against class members;

3) the desirability or undesirability of concentrating the

litigation of the claims in the particular forum; and 4) the

likely difficulties in managing a class action. Fed. R. Civ. P.

23(b)(3)(A)-(D). "A consideration of these factors requires the

court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1190 (9th Cir. 2001) (quotation marks and citation omitted). "Normally, when a plaintiff fails to meet the predominance requirement, the court need not address the superiority requirement." Soares v. Flowers Foods, Inc., 320 F.R.D. 464, 484 (N.D. Cal. 2017) (collecting cases).

### C.    Federal Rule of Civil Procedure 23(c)(4)

Federal Rule of Civil Procedure 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." As such, "[e]ven if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23[(c)(4)] authorizes the district court in appropriate cases to isolate the common issues . . . and proceed with class treatment of these particular issues." Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996) (citations omitted). Issue-class certification, however, is appropriate only if it would "materially advance the litigation." See Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc., 308 F.R.D. 630, 633 (N.D. Cal. 2015) (citation omitted); see also Rahman v. Mott's LLP, 693 F. App'x 578, 579 (9th Cir.

12

2017) ("Certification of an issues class under Rule 23(c)(4) is
appropriate only if it materially advances the disposition of
the litigation as a whole." (internal quotation marks and some
citations omitted) (citing Valentino v. Carter-Wallace, Inc., 97
F.3d 1227, 1229-30 (9th Cir. 1996))).

## DISCUSSION

## I.    Standing

The Government argues that the Camp Plaintiffs lack
Article III standing to bring their claims for economic damages
because they have not demonstrated a redressable injury. See
Govt.'s Opp. at 14-18. Lack of standing strips the Court of
jurisdiction; thus, the Court addresses the standing issue
before discussing the merits of the Motion. See In re E. Coast
Foods, Inc., 80 F.4th 901, 905 (9th Cir. 2023) ("The question of
whether a party has standing is a threshold issue that must be
addressed before turning to the merits of a case." (citing Horne
v. Flores, 557 U.S. 433, 445, 129 S. Ct. 2579, 174 L. Ed. 2d 406
(2009))).

The Government argues that the Camp Plaintiffs have
not identified a redressable injury because they have failed to
demonstrate whether they have already been fully compensated for
their injuries by the Government. See Govt.'s Opp. at 14.
Although the Camp Plaintiffs brought their suit exclusively
against the Landlord Defendants, the Government contends that

13

the Camp Plaintiffs cannot manufacture standing by selectively
suing the Landlord Defendants while ignoring payments the Camp
Plaintiffs received from it. See id. at 15.

     To support its argument that the Camp Plaintiffs have
already been made whole, the Government asserts, that after the
November 2021 fuel leak from Red Hill ("Red Hill Incident"), it
initiated a response to assist impacted residents that continued
until the Hawai`i Department of Health ("HDOH") lifted its water
advisory warning residents of water contamination ("HDOH
Advisory") in March 2022. See Govt.'s Opp. at 4. This assistance
included offering alternative lodging in hotels and providing
monetary payments to residents. See Govt.'s Opp., Declaration of
Alanna Horan ("Horan Decl."), Exh. B at THOMPSON000026
(December 29, 2021 letter from the Commander of the Navy Region
Hawaii to William Thompson). For service members, these payments
were part of their Temporary Lodging Allowance ("TLA"), which
also covered per diem payments for meals and incidental
expenses. See id., Exh. C (December 17, 2021 email from Tanya
Grant, Director of Operations, Ohana Navy Communities, to
William Thompson)). Affected federal civilian employees were
also given per diem payments, with the total amount for all
residents varying based on household demographics and whether
they chose to remain in their homes or relocate to a hotel. See

id., Exh. E (Joint Base Pearl Harbor-Hickam Water Updates Webpage) at 7.

The Government argues that its payments to the Camp Plaintiffs exceeded the total rent that the Camp Plaintiffs paid during the Red Hill Incident period, which lasted from November 2021 through March 2022. [Govt.'s Opp. at 16.] Relying on a formula,[3] which assumes "that Plaintiffs can recover the full amount from the date of the spill through when their homes were cleared by HDOH," the Government argues that the Thompsons received approximately $915 in surplus payments, and the Camps received $11,409 in surplus payments. See id. at 16 & n.6.

In further support of its standing argument, the Government submits that the Camps acknowledged they "may have saved some of" the money they received from the Government; see Horan Decl., Exh. N (transcript excerpts of 8/14/25 Deposition of Martha Jennifer Camp ("Mrs. Camp Depo., dkt. no. 89-15")) at 94-95, 101, 122-23; and Mr. Thompson stated that he could only name extra cases of water bought from Costco as additional expenses resulting from the Red Hill Incident, [Horan Decl., Exh. P (transcript excerpts of 9/4/25 Deposition of William Thompson ("Mr. Thompson Depo., dkt. no. 89-17")) at 98-100,

_____

[3] The Government's formula is "(rent/30 days x 10 days) + 3 months x rent + (rent/31 days x # of days in March the home was under HDOH Advisory)." [Govt.'s Opp. at 16.]

130]. The Government argues that this testimony shows that the Camp Plaintiffs assert economic injuries without considering if the Government's payments fully compensated them for the economic injuries they allegedly suffered as a result of the Red Hill Incident. See Govt.'s Opp. at 17. The Government therefore argues that the Camp Plaintiffs have no redressable injury and lack standing. See id. at 18.

The Government does not dispute, however, that the Camp Plaintiffs continued paying rent during the Red Hill Incident period. In other words, there is no dispute that the Camp Plaintiffs (and the proposed class members) suffered "the temporary loss of use of [their] money" during the period they allege their homes were uninhabitable. See Van, 61 F.4th at 1064 (quotation marks omitted and citation omitted). The Camp Plaintiffs argue that they should not have had to pay any amount of rent for allegedly uninhabitable housing. See Motion, Mem. in Supp. at 1-2; Reply at 14-15. The Camp Plaintiffs, however, were allegedly forced to pay the full amount of rent during the Red Hill Incident period. See Reply at 7-8 (alleging that "the central question of harm" is that the Camp Plaintiffs were charged unreduced rent for homes that were uninhabitable). Even if the Camp Plaintiffs later received compensation from the Government for rent paid during the Red Hill Incident period, the temporary loss of money in the form of rent payments

16

"constitutes an injury in fact for purposes of Article III." See
Van, 61 F.4th at 1064 (quotation marks omitted and citation
omitted); cf. Mazza v. Am. Honda Motor Co., 666 F.3d 581, 595
(9th Cir. 2012) (holding that, when the plaintiffs "contend that
class members paid more for [a product] than they otherwise
would have paid, or bought it when they otherwise would not have
done so" they have sufficiently alleged an Article III injury in
fact).[4]

     The Camp Plaintiffs' injury is also fairly traceable
to the Landlord Defendants' challenged conduct. The Camp
Plaintiffs allege that the Landlord Defendants demanded full
rent payments for housing that allegedly lacked safe, potable
water. [Reply at 14-15.] Whether some expenses were later
compensated by the Government, [Govt.'s Opp. at 22,] does not
refute the Camp Plaintiffs' allegations that the Landlord
Defendants retained rent payments despite alleged breaches of
the Landlord Defendants' uniform duties. See Reply at 15. As a
result, the alleged economic injury flows directly from the
Landlord Defendants' collection of rent during the period of
uninhabitability. The Court can likely redress the Camp
Plaintiffs' alleged economic injuries with an award of damages,

---

[4] Mazza has been overruled, in part, on other grounds by
Olean, 31 F.4th at 682 & n.32.

17

subject to any affirmative defense or offset argument advanced
by either the Government or the Landlord Defendants.
Accordingly, the Court finds that the Camp Plaintiffs have
sufficiently established standing.

## II.  **Class Certification Under Rule 23(b)(3)**

The Camp Plaintiffs seek to certify the Class and
Subclass under Rule 23(b)(3). [Motion, Mem. in Supp. at 10.] To
do so, they must affirmatively demonstrate by a preponderance of
the evidence that they meet the prerequisites of Rule 23(a), see
Black Lives Matter, 113 F.4th at 1258, and that they meet the
requirements of Rule 23(b)(3), see Miles v. Kirkland's Stores
Inc., 89 F.4th 1217, 1222, 1225 (9th Cir. 2024). The Court
assumes for purposes of this Order that the Camp Plaintiffs can
satisfy the Rule 23(a) prerequisites. See, e.g., Runyon v.
Bostik Inc., Case No. 5:16-cv-02413-RGK-SP, 2017 WL 5988019, at
*2 (C.D. Cal. Mar. 28, 2017) (finding that the plaintiffs failed
to satisfy Rule 23(b)(3)'s predominance requirement without
addressing Rule 23(a)'s prerequisites). For the reasons that
follow, the Court finds that the Camp Plaintiffs' proposed Class
and Subclass cannot satisfy the predominance requirement under
Rule 23(b)(3).

A.    **Federal Rule of Civil Procedure 23(b)(3)**

1.    **Examination of the *Camp* Plaintiffs' Claims**

The first step of determining whether the Camp

Plaintiffs satisfy the predominance requirement is examining the

elements of their claims. As the Ninth Circuit has explained:

> In order for the plaintiffs to carry their
> burden of proving that a common question
> predominates, they must show that the common
> question relates to a central issue in the
> plaintiffs' claim. See Wal-Mart [Stores, Inc. v.
> Dukes], 564 U.S. [338,] 349–50, 131 S. Ct. 2541
> [(2011)]. Therefore, "[c]onsidering whether
> 'questions of law or fact common to class members
> predominate' begins, of course, with the elements
> of the underlying cause of action." Erica P. John
> Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809,
> 131 S. Ct. 2179, 180 L. Ed. 2d 24 (2011) (quoting
> Fed. R. Civ. P. 23(b)(3)).

Olean, 31 F.4th at 665 (some alterations in Olean).

As discussed *supra*, the following claims brought by

the Camp Plaintiffs remain at issue: Count I; Count IV;

Count VI; Count VII; Count VIII; and Count IX. Thus, the Court

begins its predominance inquiry by examining the elements of the

Camp Plaintiffs' remaining claims. See id.

As to Count I, "in order for a plaintiff to prevail on

a negligence claim, the plaintiff is required to prove all four

of the necessary elements of negligence: (1) duty; (2) breach of

duty; (3) causation; and (4) damages." Kaho`ohanohano v. Dep't

of Hum. Servs., 117 Hawai`i 262, 287 n.31, 178 P.3d 538, 563

n.31 (2008) (citation omitted). To prevail on a private nuisance

claim, *i.e.*, Count IV, the Camp Plaintiffs must show, *inter
alia*, that "'[the Landlord Defendants'] conduct [was] a legal
cause of an invasion of [the Camp Plaintiffs'] interest in the
private use and enjoyment of land . . . .'" See Powers v.
Airbnb, Inc., CIV NO. 23-00243 LEK-WRP, 2024 WL 1885727, at *3
(D. Hawai`i Apr. 30, 2024) (quoting Lee Ching v. Loo Dung, 145
Hawai`i 99, 115, 446 P.3d 1016, 1032 (Ct. App. 2019)).[5] As to
Count VII, "[u]nder Hawai`i law, a trespass occurs when a person
intentionally (a) enters land in the possession of the other, or
causes a thing or third person to do so, or (b) remains on the
land, or (c) fails to remove from the land a thing which he is
under a duty to remove." Id. (brackets, citation, and internal
quotation marks omitted). Similarly, to prevail on a breach of
contract claim, *i.e.*, Count VIII, the Camp Plaintiffs must
establish, *inter alia*, that "[the Landlord Defendants] failed to
perform as required under the contract, and that the [the
Landlord Defendants'] failure to perform caused the [Camp
Plaintiffs] damages." See Hele Ku KB, LLC v. BAC Home Loans
Servicing, LP, 873 F. Supp. 2d 1268, 1287 (D. Hawai`i 2012)
(citation omitted); see also Calipjo v. Purdy, 144 Hawai`i 266,
273, 439 P.3d 218, 225 (2019).

---

[5] The Intermediate Court of Appeals' decision in Lee Ching
was reversed by the Hawai`i Supreme Court on other grounds. 148
Hawai`i 416, 477 P.3d 856 (2020).

With respect to Count VI, the Camp Plaintiffs' breach of the implied warranty of habitability claim, the Hawai`i Supreme Court has long held that proving such a claim requires a fact-intensive analysis, which considers, *inter alia*, "the materiality of [the] alleged breach, both the seriousness of the claimed defect and the length of time for which it persists . . . ." Lemle v. Breeden, 51 Haw. 426, 436, 462 P.2d 470, 476 (1969); see also id. at 436, 462 P.2d at 476 ("Each case must turn on its own facts.") Further, the Hawai`i Supreme Court examines whether or not the landlord "had it within [its] power" to address the breach. See id. at 434, 462 P.2d at 475 (holding that a landlord had it within her power to exterminate rats from a dwelling and breached the implied warranty of habitability when she neglected to do so); accord Restatement (Second) of Property § 17.6 cmt. c ("The landlord is subject to liability under the rules of this section only for conditions of which he is aware, or of which he could have known in the exercise of reasonable care."). A plaintiff that establishes that a landlord breached the implied warranty of habitability is eligible for "basic contract remedies of damages, reformation, and rescission." Lemle, 51 Haw. at 436, 462 P.2d at 475. A landlord can seek an offset of damages if the plaintiff remained on the property during the period of inhabitability. See Souza v. Fisher, CAAP-13-0001699, 2017 WL 1293657, at *5 (Hawai`i Ct.

App. Apr. 7, 2017) (holding that "although there were breaches of the implied warranty of habitability, [the plaintiff] still owed a reduced rent for remaining on the property").

Count IX specifically alleges violations of Hawai`i Revised Statutes Sections 521-10, 521-42(a)(1), and 521-63. [Camp Complaint at ¶¶ 109-10, 112.] "HRS § 521-42(a)(1) is the Hawaii state statutory codification of the implied warranty of habitability." Barber v. Ohana Mil. Cmtys., LLC, Civil No. 14-00217 HG-KSC, 2014 WL 3529766, at *7 (D. Hawai`i July 15, 2014). Section 521-42 states, in pertinent part:

> The landlord shall at all times during the tenancy:
>
> (1)  Comply with all applicable building and housing laws materially affecting health and safety;
>
> (2)  Keep common areas of a multi-dwelling unit premises in a clean and safe condition;
>
> (3)  Make all repairs and arrangements necessary to put and keep the premises in a habitable condition;
>
> (4)  Maintain all electrical, plumbing, and other facilities and appliances supplied by the landlord in good working order and condition, subject to reasonable wear and tear;
>
> (5)  Except in the case of a single family residence, provide and maintain appropriate receptacles and conveniences for the removal of normal amounts of rubbish and garbage, and arrange for the frequent removal of such waste materials; and

>    (6)  Except in the case of a single family
>    residence, or where the building is not required
>    by law to be equipped for the purpose, provide
>    for the supplying of running water as reasonably
>    required by the tenant.

Section 521-63 addresses remedies, and it states, in pertinent

part:

>    (a)  If any condition within the premises
>    deprives the tenant of a substantial part of the
>    benefit and enjoyment of the tenant's bargain
>    under the rental agreement, the tenant may notify
>    the landlord in writing of the situation and, if
>    the landlord does not remedy the situation within
>    one week, terminate the rental agreement. The
>    notice need not be given when the condition
>    renders the dwelling unit uninhabitable or poses
>    an imminent threat to the health or safety of any
>    occupant. . . .
>
>    (b)  If the condition referred to in subsection
>    (a) was caused wilfully or negligently by the
>    landlord, the tenant may recover any damages
>    sustained as a result of the condition.
>
>    (c)  If the landlord removes or excludes the
>    tenant from the premises overnight without cause
>    or without court order so authorizing, the tenant
>    may recover possession or terminate the rental
>    agreement and, in either case, recover an amount
>    equal to two months rent or free occupancy for
>    two months, and the cost of suit, including
>    reasonable attorney's fees. If the rental
>    agreement is terminated, the landlord shall
>    comply with section 521-44(c). . . .

After carefully reviewing the evidence filed in

support of and in opposition to the Motion, as well as the

parties' arguments in their memoranda, the Court finds that a

common body of evidence cannot establish essential elements for

most of the Camp Plaintiffs' causes of action for the reasons
below. See Olean, 31 F.4th at 666.

### 2.    Causation and Damages Are Fatal to Predominance

Declarations filed by the Landlord Defendants'
experts, which were not challenged by any testimony or evidence
submitted by the Camp Plaintiffs, purport to establish that
exposure to contaminated water varied between neighborhoods,
between homes in the same neighborhood, and between residents of
the same home. See Landlords' Opp., Declaration of R. Jeffrey
Davis ("Davis Decl.") at ¶¶ 20-58;[6] id., Declaration of Kristian
Fried ("Dr. Fried Decl.") at ¶¶ 25-34.[7] R. Jeffrey Davis
("Davis"), an expert retained by the Landlord Defendants to
provide analysis regarding, *inter alia*, the groundwater and
distribution system aspects of the JBPHH Water System, [Davis
Decl. at ¶ 6,] opined that contamination of the JBPHH Water
System "resulted in a short period of contamination . . . of

---

[6] R. Jeffrey Davis is a licensed Professional Engineer and
Certified Groundwater Professional "with a specialized focus on
water contamination assessment, groundwater modeling, water
distribution modeling, and litigation support." [Davis Decl. at
¶¶ 3-4.]

[7] Dr. Kristian Fried is a Senior Consultant for Integral
Consulting Inc. and holds a doctoral degree in toxicology from
the University of Kansas Medical Center, and a doctoral degree
in chemistry from the Technical University of Munich, Germany.
[Dr. Fried Decl. at ¶¶ 1, 3.] She has an expertise in toxicology
and risk assessment with a specialized focus on human health
risk assessment. [Id. at ¶¶ 4-6.]

24

variable concentrations and to a limited portion of the overall
. . . distribution system," [id. at ¶ 57]. Davis also opined
that "not all residents were similarly or equally affected," and
"some residents never received . . . contaminated [water] at
their home address . . . ." [Id. at ¶ 58.]

Further, HDOH's June 2023 report prepared by Roger
Brewer, Ph.D. ("Exposure Assessment"), supports that exposure
varied among residents. The Exposure Assessment found that
exposure to the contaminated water "varied both spatially and
temporally within the drinking water system," making it
"impossible to know the true exposure experienced by any
individual." [Landlords' Opp., Declaration of Randall C.
Whattoff ("Whattoff Decl."), Exh. 12 (Exposure Assessment) at
i.] The Exposure Assessment also explained that "[i]solated
pockets of contaminated water" moved through pipes throughout
Ohana Military Communities, meaning one resident might be
affected while an "[a]djacent neighbor[] who returned home later
. . . might notice no problems with the water discharging from
their taps." [Id. at 2-3.]

Likewise, the impact of the event was not uniform:
residents responded in different ways, with some staying in
hotels, some remaining at home, some taking a hybrid approach,
and some being deployed away from O`ahu. See Dr. Fried Decl. at
¶¶ 42-54. The Landlord Defendants retained Dr. Kristian Fried

25

("Dr. Fried") who opined that heterogeneous human behavioral patterns and human tendencies to be "risk averse or risk seeking" resulted in significant variability in how residents changed their behaviors in response to the Red Hill Incident. See id. at ¶¶ 42–45 (quotation marks and citation omitted). According to Dr. Fried, "[e]xternal factors, such as third-party risk-mitigation measures" including "alternatives to residential tap water," as well as the availability of alternative housing and economic support also affected how individual residents responded to the Red Hill Incident. [Id. at ¶¶ 46–47.] The Camp Plaintiffs' deposition testimony further illustrates how each of them experienced the Red Hill Incident differently:

-Mrs. Camp claims to have observed substantial changes in her water supply. Mrs. Camp testified that she smelled gasoline from every faucet, saw cloudy water, and observed a "rainbow sheen," and claimed these conditions persisted for months, even after her home was flushed. [Whattoff Decl., Exh. 6 (transcript excerpts of 8/14/25 Deposition of Martha Jennifer Camp ("Mrs. Camp Depo., dkt. no. 90-10")) at 29, 34, 39–40, 42–43.] She accepted the Government's offer of alternative lodging and stayed with her children in Waikiki hotels throughout the Litigation Period.[8] See Whattoff Decl., Exh. 6 (Mrs. Camp Depo., dkt. no. 90-10) at 13, 53–55.

-Mr. Camp, by contrast, was on active duty as a member of the United States Coast Guard and was deployed for all but four days of the Litigation Period. See Whattoff Decl., Exh. 8 (transcript excerpts of 8/13/25 Deposition of Adam Camp

---

[8] The Landlord Defendants define the "Litigation Period" as the period of time between November 20, 2021 and the date that HDOH advised residents that the water in their homes was safe to drink. [Landlords' Opp. at 5 n.1.]

("Mr. Camp Depo., dkt. no. 90-11")) at 30-31, 80-82.
Mr. Camp stayed with his family at their home and the
Waikiki hotels during the four days he was not deployed.
See id. at 80, 83. He testified that during that brief
period, he smelled gasoline, and he "finally agreed to
seeing a sheen" on the water. [Id. at 82-83, 91.]

-Mr. Thompson bought some bottled water, which he used for
drinking, cooking, brushing his teeth, and taking a shower,
[Whattoff Decl., Exh. 10 (transcript excerpts of 9/4/25
Deposition of William Thompson ("Mr. Thompson Depo., dkt.
no. 90-13")) at 92-93, 101-02,] but he testified that his
family's routine for eating meals, doing laundry, and
socializing remained the same, [id. at 141, 147]. He
recalled smelling gas at some point but could not provide
any details and never observed any visual changes to the
water. See id. at 78-79.

-Mrs. Thompson testified that she never observed any smell or
visual changes to the water, although she recalled "a
couple" of instances where her hands did not feel clean
after washing them, an observation she stated occurred
"before any recollection of [their] community even being
affected." [Whattoff Decl., Exh. 11 (transcript excerpts of
9/5/25 Deposition of Juanita Thompson ("Mrs. Thompson
Depo., dkt. no. 90-14")) at 44-45.]

In sum, the body of evidence demonstrates that the experiences
of the named Camp Plaintiffs were highly individualized, varying
significantly in terms of exposure, perception, and resulting
lifestyle disruption. Proving if the Red Hill Incident was the
legal cause of the putative class members' injuries will require
personalized determinations to satisfy many of Plaintiffs'
claims. Such individual-by-individual determinations preclude a
finding of predominance. See Lara, 25 F.4th at 1138.

        The Camp Plaintiffs argue that the disparate impact of
the Red Hill Incident does not defeat class certification

because "Rule 23 requires predominance, not uniformity." [Reply
at 7.] They point to HDOH health notices warning residents to
avoid drinking water from the JBPHH Water System as a common
body of evidence that can help them establish, as a matter of
law, that the Landlord Defendants "did not satisfy basic
warranties and laws governing habitability." See id. at 7; see
also id., Declaration of James J. Bickerton, Exh. 1
(November 29, 2021 HDOH press release). The Camp Plaintiffs also
assert that, even if some residents were unaffected or less
affected than others by the Red Hill Incident, the disparate
impact would not defeat certification. [Reply at 8-9.]

Assuming without deciding that the HDOH health notices
and related evidence can serve as a common body of evidence to
prove claims such as the Camp Plaintiffs' Section 521-63 claim
in Count IX, the Camp Plaintiffs do not address the issue that
many of their claims require them to establish causation and
damages. Nor do the Camp Plaintiffs specifically point to
generalized proof that can help them prove these elements to
their claims. Pointing generally to "systemwide data and
policies," [id. at 7,] without more, is too vague to establish
predominance. See Black Lives Matter, 113 F.4th at 1258 (9th
Cir. 2024) ("[P]laintiffs cannot plead their way to class
certification through just allegations and assertions." (citing
Wal-Mart, 564 U.S. at 350, 359, 131 S. Ct. 2541)).

The Camp Plaintiffs cite several district court cases
for the proposition that "variations in individual impacts of
the tortious conduct do not warrant denial of certification when
the impacts were caused by a single common act or conduct."
[Reply at 9 (citing O'Connor v. Boeing North Am., Inc., 184
F.R.D. 311 (S.D. Cal. 1998); Yslava v. Hughes Aircraft Co., 845
F. Supp. 705 (D. Ariz. 1993); Stone v. Advance Am., Cash Advance
Ctrs. Inc., 278 F.R.D. 562 (S.D. Cal. 2011); Clevenger v. Welch
Foods Inc., 342 F.R.D. 446 (C.D. Cal. 2022)).] Most of these
cases, however, are distinguishable.

For instance, in O'Connor, the district court
certified the class only after the plaintiffs adequately
addressed its "concern that **individual** proximate cause questions
will overshadow the common questions relating to [the
d]efendants' liability . . . ." 184 F.R.D. at 340 (emphasis in
O'Connor). The plaintiffs addressed the O'Connor court's
concerns through the introduction of expert testimony,
scientific modeling, and other forms of generalized proof. See
id. at 340-41. The Camp Plaintiffs present no such evidence. The
plaintiffs in Yslava proposed twenty-four subclasses
"representing precise geographic areas where plaintiffs lived,
worked or went to school." 845 F. Supp. at 712. The district
court's class certification analysis hinged on common issues
within each specified geographical area. See id. at 712-13.

Unlike the detailed geographic subclasses in Yslava, the Camp
Plaintiffs only present one general class and one subclass,
without any detailed geographic breakdown. See Motion, Mem. in
Supp. at 2.

In Clevenger, the district court found that the
plaintiffs' claims relied on an objective "reasonable consumer"
standard capable of class-wide resolution, requiring no
individualized showing of reliance. 342 F.R.D. at 459; see also
id. at 460 ("But the reasonable consumer test is inherently an
objective analysis, and thus issues of materiality may be
decided on a class-wide basis. At this stage, that is all that
is required." (some citations omitted) (citing Amgen, 568 U.S.
at 459, 133 S. Ct. 1184)). By contrast, not only do the Camp
Plaintiffs fail to present evidence that can serve as a general
proof to establish their claims, they also cannot rely on an
"objective analysis" standard like the one at issue in
Clevenger. Finally, the district court refused to certify a
class in Stone, after finding that the plaintiffs could not
satisfy the commonality requirement under Rule 23(a) and did not
engage in a predominance analysis. 278 F.R.D. at 569. Stone
therefore offers no support for the Camp Plaintiffs'
predominance argument.

Proving and calculating damages also present
individual hurdles.

> The Court recognizes that "in this circuit . . .
> damage calculations alone cannot defeat
> certification." <u>Yokoyama v. Midland Nat. Life.
> Ins. Co.</u>, 594 F.3d 1087, 1094 (9th Cir. 2010).
> Still, Plaintiffs "must be able to show that
> their damages stemmed from the defendant's
> actions that created the legal liability."
> <u>Pulaski & Middleman, LLC v. Google, Inc.</u>, 802
> F.3d 979, 987–88 (9th Cir. 2015). Additionally,
> "plaintiffs must establish at the certification
> stage that 'damages . . . [can] feasibly and
> efficiently be calculated once the common
> liability questions are adjudicated.'" <u>Lilly v.
> Jamba Juice Company</u>, 308 F.R.D. 231, 244 (N.D.
> Cal. 2014) (citing <u>Leyva v. Medline Indus. Inc.</u>,
> 716 F.3d 510, 514 (9th Cir. 2013)).

<u>Petersen v. Costco Wholesale Co.</u>, 312 F.R.D. 565, 583 (C.D. Cal.

2016) (alterations in <u>Petersen</u>). The <u>Camp</u> Plaintiffs have not

met their burden of showing that their damages stemmed from the

Landlord Defendants' actions that allegedly created the legal

liability, nor that damages resulting from that alleged conduct

can be efficiently calculated.

     The <u>Camp</u> Plaintiffs initially proposed "a common

methodology" based on rent abatement to establish damages. <u>See</u>

Motion, Mem. in Supp. at 24 (pointing to the amount of rent paid

by putative class members to the Landlord Defendants during the

Red Hill Incident period as the "common methodology" to

"determin[e] the nature and size of each member's claim").

However, this methodology fails to account for the TLA and per

diem payments made to some residents. Determining whether a

class member suffered an uncompensated economic injury pursuant

to the Camp Plaintiffs' proposed common methodology requires
netting these third-party payments against the Camp Plaintiffs'
alleged losses. This requires, at the very least, analyzing each
putative class member's specific expenses, the specific amount
of third-party assistance received, and whether that assistance
fully compensated them. See Moeller v. Taco Bell Corp.,
No. C 02-5849 PJH, 2012 WL 3070863, at *5 (N.D. Cal. July 26,
2012) ("Put another way, because damages must be based on an
individualized determination of liability, common questions of
law and fact regarding entitlement to damages do not predominate
over questions affecting only individual members.").

        The "loss of use" damages theory advanced by the Camp
Plaintiffs in their Reply also cannot be standardized. See Reply
at 10-12. Even if each putative class member was entitled to be
fully compensated under the Camp Plaintiffs' loss of use theory,
each class member would still have to introduce individualized
evidence to establish, for instance, how much they paid for
rent. More crucially, however, the Camp Plaintiffs' loss of use
damages theory is predicated upon a finding of tortious conduct.
In other words, to award loss of use damages for the deprivation
of the use of property, the Court must first find that the
deprivation was the result of the Landlord Defendants' tortious
conduct. See Fukida v. Hon/Hawaii Serv. & Repair, 97 Hawai`i 38,
45, 33 P.3d 204, 211 (2001) ("[W]e hold that, where a person is

deprived of the use of his or her property due to the tortious
conduct of another, he or she may recover 'loss of use'
damages."). As previously discussed, such a finding would
require individualized inquiries into causation and harm. For
these reasons, the Court finds that individual issues
predominate over common issues and denies the Camp Plaintiffs'
request to certify the proposed Class and Subclass under
Rule 23(b)(3).

         The Court also declines to exercise its discretion to
fashion subclasses per claim. See Hawkins v. Comparet-Cassani,
251 F.3d 1230, 1238 (9th Cir. 2001) ("The district court is not
'to bear the burden of constructing subclasses' . . . ; rather,
the burden is on Plaintiffs to submit proposals to the court."
(quoting United States Parole Commission v. Geraghty, 445 U.S.
388, 408, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980)). Even if the
Court were to assume that new subclasses could cure the Camp
Plaintiffs' predominance issues, the Court would nevertheless
conclude that bifurcating the action between class claims and
non-class claims would not be a superior method for adjudicating
the controversy. See Fed. R. Civ. P. 23(b)(3). Bifurcating the
action between claims would likely result in higher litigation
costs with little benefit. For example, discovery responsive to
the Camp Plaintiffs' negligence claims would likely overlap with
discovery for the Camp Plaintiffs' trespass claims, and

conducting the same discovery twice would likely increase litigation expenses. Further, for the reasons that follow, a superior alternative exists under Federal Rule of Civil Procedure 23(c)(4).

## III. <u>Issue Class Certification Under Rule 23(c)(4)</u>

"The Ninth Circuit has endorsed the use of issue classes where individualized questions predominate and make certification under Rule 23(b)(3) inappropriate." <u>In re ConAgra Foods, Inc.</u>, 90 F. Supp. 3d 919, 1035 (C.D. Cal. 2015) (citation omitted) (citing <u>Valentino v. Carter-Wallace, Inc.</u>, 97 F.3d 1227, 1234 (9th Cir. 1996)).[9] While the Ninth Circuit has not delineated "which cases might be 'appropriate cases' for severance of particular issues," <u>Amador v. Baca</u>, 299 F.R.D. 618, 636 (C.D. Cal. 2014),[10] "[i]n at least some circumstances, it is appropriate to certify a class to 'accurately and efficiently resolve the question of liability, while leaving the potentially difficult issue of individualized damage assessments for a later day,'" <u>Kamakahi v. Am. Soc'y for Reprod. Med.</u>, 305 F.R.D. 164,

---

[9] <u>In re ConAgra Foods, Inc.</u> was affirmed by the Ninth Circuit in <u>Briseno v. ConAgra Foods, Inc.</u> 844 F.3d 1121 (9th Cir. 2017); 674 F. App'x 654 (9th Cir. 2017).

[10] The district court in <u>Amador</u> amended its order on other grounds after the plaintiffs filed a renewed motion to certify a liability issue class. 2014 WL 10044904 (Dec. 18, 2014). However, the district court later decertified the liability issue class. 2016 WL 6804910 (July 27, 2016).

176 (N.D. Cal. 2015) (quoting <u>Jimenez v. Allstate Ins. Co.</u>, 765
F.3d 1161, 1164 (9th Cir. 2014)). The <u>Camp</u> Plaintiffs argue that
"[t]he central question in the present case . . . is a focus on
the liability issue." <u>See</u> Motion, Mem. in Supp. at 19. The Court
agrees. Among others some of the central issues in the instant
case are whether the Landlord Defendants had a duty to the <u>Camp</u>
Plaintiffs and whether they are liable for a breach of that
alleged duty.

"A formal motion under [Rule 23](c)(4) is unnecessary;
the court may act on its own initiative." 7AA Wright & Miller's
Fed. Prac. & Proc. Civ. § 1790 & n.8 (3d ed. 2025) (collecting
cases). Although no district court in the Ninth Circuit appears
to have certified a class pursuant to Rule 23(c)(4) *sua sponte*,
district courts outside of the Ninth Circuit have utilized
Rule 23(c)(4) on their own initiative. <u>See, e.g.</u>, <u>In re Foreign</u>
<u>Exch. Benchmark Rates Antitrust Litig.</u>, 407 F. Supp. 3d 422,
436-38 (S.D.N.Y. 2019) (certifying a Rule 23(c)(4) issue class
for certain liability questions despite there being no
indication in the district court's opinion and order that the
plaintiffs requested issue class certification in their motion
for class certification); <u>Nelson v. Wal-Mart Stores, Inc.</u>, 245
F.R.D. 358, 380 (E.D. Ark. 2007) (certifying on its own
initiative a Rule 23(c)(4)(A) class on the issues of classwide
liability, declaratory relief, and equitable relief after

finding that "option makes the best use of judicial resources
and the efficiencies of the class-action device to materially
advance this litigation"); Brown v. Saint-Gobain Performance
Plastics, Civil No. 16-cv-242-JL, 2023 WL 9023158, at *22
(D.N.H. Dec. 29, 2023) (certifying a liability class despite the
district court opinion and order lacking any indication that the
plaintiffs requested issue class certification in their motion
for class certification). Further, it is well recognized that,
after class certification, a district court can *sua sponte*
certify issues subclasses. Mowdy v. Beneto Bulk Transp.,
No. C 06-05682 MHP, 2010 WL 11706895, at *4 (N.D. Cal. July 8,
2010) ("Indeed, a court may exercise the authority to certify
only particular issues *sua sponte*." (citing Wright, Miller &
Kane, 7b Federal Practice and Procedure: Civil 3d § 1790; United
States Parole Comm'n v. Geraghty, 445 U.S. 388, 395 (1980))).

Because the Ninth Circuit has long endorsed the use of
issue classes where individual issues predominate, see
Valentino, 97 F.3d at 1234, and because the Court has broad
discretion in shaping class actions, see Gonzalez v. U.S.
Immigr. & Customs Enf't, 975 F.3d 788, 807 (9th Cir. 2020), the
Court finds that the instant case may be appropriate for class
certification under Rule 23(c)(4) for adjudication of several
liability issues. For instance, certifying a class as to whether
the Landlord Defendants had a duty to mitigate and address the

36

harm caused to the Camp Plaintiffs as a result of the Red Hill
Incident can potentially address several claims. The Court,
however, reserves ruling on certifying one or more issue classes
until the parties submit additional briefing as detailed below.

The Court ORDERS the parties to meet and confer to
identify the liability issues that should be certified pursuant
to Rule 23(c)(4). After the conferral, the Court ORDERS the
parties to file a joint statement not to exceed **ten pages**
identifying the liability issues by **January 30, 2026**. If the
parties cannot agree on the liability issues, they are ORDERED
to individually submit briefs on their respective issues not to
exceed **five pages** by **January 30, 2026**. Upon receiving the
parties' briefs, the Court will set a briefing schedule and
determine whether to hold a hearing.

### CONCLUSION

On the basis of the foregoing, the Camp Plaintiffs'
Motion for Class Certification, filed May 8, 2025, is DENIED
WITHOUT PREJUDICE. Powell's joinder in the Camp Plaintiffs'
Motion for Class Certification, filed May 12, 2025, is DENIED AS
MOOT.

The parties are ORDERED to submit a joint statement,
or in the alternative, further briefing by **January 30, 2026**. The
joint statement or further briefing should identify the

37

liability issues that should be certified pursuant to

Rule 23(c)(4), if any exist.

      IT IS SO ORDERED.

      DATED AT HONOLULU, HAWAII, January 15, 2026.



/s/ Leslie E. Kobayashi

Leslie E. Kobayashi
Senior U.S. District Judge

**MARTHA JENNIFER CAMP, ET AL. VS. OHANA MILITARY COMMUNITIES, LLC, ET AL; CV 24-00003 LEK-KJM; ORDER DENYING WITHOUT PREJUDICE THE CAMP PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; DENYING AS MOOT POWELL'S JOINDER TO THE MOTION; AND ORDERING THE SUBMISSION OF A JOINT STATEMENT, OR ALTERNATIVELY FURTHER BRIEFING, REGARDING RULE 23(C)(4) CLASS CERTIFICATION**